# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

———————————————————————— X

Adrianne Summers,

                                     Plaintiff,

v.

Corning Community College,
Katherine Douglas in her official and
individual capacity,
Nanette Nicholas in her official and
individual capacity,
Jeffrey Miller in his official and
individual capacity,
Don Heins in his official and
individual capacity,
Jennifer Simmons in her official and
individual capacity,
Jessica Benninger in her official and
individual capacity,
Nancy Latour in her official and
individual capacity,
and Kesha Davis in her official and
individual capacity,

                                     Defendants.

———————————————————————— X

Civil Action No. 15 CV 6724-W

COMPLAINT

UNITED STATES DISTRICT COURT
FILED
DEC 0 4 2015
MICHAEL J. ROEMER, CLERK
WESTERN DISTRICT OF NY

       Plaintiff Adrianne Summers ("Adrianne"), by and through her attorneys of record

Marsh Law Firm PLLC alleges for her complaint as follows:

## PRELIMINARY STATEMENT

       1.     This is an action by Adrianne against Corning Community College ("CCC" or the

"School") and other defendants for sexual harassment, discrimination, and retaliation in

connection with CCC's gross mishandling of her complaint of sexual assault by another student.

CCC discriminated against her, on the basis of sex, demonstrating its deliberate indifference, by

failing to investigate or provide Adrianne with the prompt and equitable resolution of her complaint of sexual harassment, including sexual assault, and retaliating against her.

2.     Rather than accord Adrianne an adequate, reliable and impartial procedure, CCC failed to provide the required investigation and measures under Title IX and repeatedly punished the victim. CCC failed to identify or provide contact information for the Title IX Coordinator, permitted if not encouraged ridicule and mockery of Adrianne, and failed to protect her from contact with her rapist and retaliation by other students and staff. Perhaps most egregiously, CCC affirmatively punished the victim, firing her from her Resident Advisor position and placing her on academic probation for advocating for her rights on campus. Rather than taking steps to prevent recurrence of sex discrimination, harassment, or retaliation and to correct discriminatory effects on Adrianne, CCC exacerbated the hostile environment against her, leaving Adrianne with no choice but to withdraw. In so doing, CCC engaged in deliberate indifference to Title IX requirements, pervasive failure to adopt compliant policies and procedures, repeated failure to provide prompt, equitable and effective redress, retaliation, and deprivation of her opportunity to participate in or benefit from educational opportunities based on sex.

3.     Adrianne seeks redress under the color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to plaintiff by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), the United States Constitution pursuant to 42 U.S.C. § 1983, and the laws and statutes of the State of New York. She also alleges constitutional, other statutory and common law claims against various administrators and others.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which confers district court jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

5. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which confers district court jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since all defendants reside or resided in this district and the events giving rise to the claims occurred in this district.

## PARTIES

7. Plaintiff Adrianne resides in the State of New York.

8. At the time of events complained of herein, Plaintiff was a student attending CCC.

9. Defendant CCC is a public educational institution located in Corning, New York.

10. Defendant Nanette Nichols is the Title IX Coordinator ("Nichols") of CCC and resides in New York.

3

11. Defendant Jeffrey Miller ("Miller") was the Safety Officer at CCC and resides inNew York.

12. Defendant Don Heins ("Heins") is the Dean of Students at CCC and resides in New York.

13. Defendant Jennifer Simmons ("Simmons") is a Resident Advisor Supervisor at CCC and resides in New York.

14. Defendant Jessica Benninger ("Benninger") is a Resident Advisor Supervisor at CCC and resides in New York.

15. Defendant Nancy Latour ("Latour") is a Dean of Students at CCC and resides in New York.

16. Defendant Kesha Davis ("Davis") is the Assistant Director of Advancement Support Services at CCC and resides in New York.

## SUMMARY OF THE FACTS

17. In the fall of 2012, Adrianne enrolled in CCC as a freshman, intending to study nursing.

18. At the outset, prior to being raped, she did well at CCC, generally receiving As and Bs and engaging in campus activities.

19. Adrianne attended church regularly and participated in a group which practiced abstinence from sex., called "No Messing Around". Adrianne believed in the principles of the group and intended to practice them.

4

## The Sexual Assault by Fellow CCC Student

20.     In the fall of 2012, Adrianne met CCC fellow freshman, Michael Brescia [hereinafter "Brescia"]. Between November 9, 2012 and November 15, 2012, they went out on a couple of dates.

21.     On two occasions, Brescia pushed Adrianne to engage in sexual activity with him.

22.     At the time, she was very young and naive. She felt "obligated" to have sex with him and afterwards felt very badly.

23.     She told him that she had joined the "No Messing Around" group, and that it was important to her to practice abstinence going forward. She specifically and repeatedly told him that she did not want a further sexual relationship with him. She said this was important to her. Brescia said that he understood and agreed.

24.     At that time, Adrianne believed him; she believed that Brescia understood and respected the limits she had placed on any further relationship with him.

25.     On November 16, 2012, Brescia told Adrianne that he was not feeling well and asked her to come over to his home to watch movies.

26.     Adrianne trusted that Brescia would abide by their agreement to avoid sexual activity.

27.     When Adrianne arrived at Brescia's home, where she had not been previously, he showed her around. He took her into the living room to watch a movie.

28.     However, to Adrianne's bewilderment and shock, Brescia turned on a pornographic movie.

29.     Brescia had not attempted to show Adrianne pornographic movies before, nor had he mentioned that he was interested in them.

5

30.     Adrianne was very uncomfortable and refused to watch. She didn't know what to do – she silently stared at her phone.

31.     Brescia appeared to accept that Adrianne would not participate in viewing pornography, and he turned off the movie. He told her that he wasn't feeling well and that they could watch a non-pornographic movie in his bedroom. At the time, Adrianne believed that he was indicating his respect for her desire not to watch pornographic movies or be dissuaded from sexual abstinence.

32.     Once in his bedroom, Adrianne and Brescia started talking.

33.     Brescia began kissing Adrianne and moving his arms and hands up Adrianne's legs and body to her breasts.

34.     Brescia asked Adrianne if this was okay, and she responded "No". However, Brescia refused to stop.

35.     Brescia forcibly grabbed Adrianne's pants and underwear and pulled them to her ankles.

36.     Adrianne attempted to hold both her pants and underwear up around her waist. However, Bresia overpowered Adrianne; she was not strong enough to loosen Brescia's grip.

37.     Adrianne panicked and began to cry silently.

38.     Brescia forcefully climbed on top of Adrianne and penetrated her with his penis against her will. She tried to force her legs closed but couldn't stop him.

39.     Adrianne was terrified.

40.     At no time had she consented to sexual intercourse with Brescia.

41.     Adrianne continued to cry. She stared at the wall as he raped her, praying that he would stop.

6

42.     Brescia continued to forcefully thrust into her against her will until he climaxed.

43.     When Brescia finished, Adrianne was able to push Brescia off of her.

44.     Adrianne turned away, fumbling to pull up her underwear and pants.

45.     Incredibly, Brescia asked Adrianne what was wrong. Adrianne told him that she did not want that to happen.

46.     Adrianne was stunned and discombobulated. She sat on the bed in a daze, not knowing what to do or what Brescia might do next.

47.     Brescia said he wanted to call his counselor. Adrianne didn't know what he was talking about, and left.

48.     When she left Brescia's house, she continued to cry, and felt upended.

49.     Subsequently, Brescia admitted that he was being treated for addiction to pornography and that he went to the Behavioral Science Unit at St. Joseph's Hospital for treatment. He stayed there approximately two to three weeks.

## Brescia's Stalking of Adrianne

50.     When he returned to campus, Brescia stalked Adrianne.

51.     Brescia followed Adrianne to the study lounge, pacing back and forth and staring at her.

52.     Brescia sent Adrianne several sexually explicit, unwelcome text messages. He wrote, "I want your pussy".

53.     He texted, "I want to do that one night again".

54.     Confused and frightened, Adrianne kept to herself, tried to manage her feelings, and attempted to pretend that she could handle what Brescia had done to her.

## Adrianne's Initial Report of the Rape to CCC, and CCC's Utter Failure to Put Adrianne in Contact with a Title IX Coordinator, Explain Her Title IX Rights, Provide Her with any Assistance or Attempt Any Investigation

55.     With Brescia back at School, Adrianne became concerned that she would have to face him in class. On December 4, 2012, Adrianne emailed Patsy Drake [hereinafter "Drake"], CCC Admissions Counselor, and asked "if something has happened and now the guy is going to be in all your classes… is there a way I can talk to someone to see about him changing his classes?"

56.     Drake offered to meet with Adrianne to discuss what happened.

57.     Adrianne decided to discuss the matter with Drake because she was female, part of the Christian group on campus, and Adrianne felt safe with her.

58.     The next day, on December 5, 2012, Adrianne explained to Drake that she had been raped by CCC student Brescia.

59.     Drake appeared to be sympathetic and referred Adrianne to the Rape Crisis of Southern Tier, now known as the Sexual Assault Resource Center [hereinafter "SARC"].

60.     SARC is not affiliated with CCC.

61.     Drake did not discuss Adrianne's options and rights under Title IX nor did she refer her to CCC's Title IX Coordinator.

62.     Drake indicated that Adrianne's conversation with Drake would be kept confidential. However, Adrianne soon found out that Drake reported the matter to Public Safety Director Jeffrey Miller [hereinafter "Miller"].

## CCC's Multi-Hour Interrogation of Adrianne, Blaming of her for the Rape, and Failure to Protect Adrianne's Rights or Provide Federally Mandated Services

63.     On December 5, 2012, Drake emailed Adrianne and informed her that Miller would like to meet with her.

8

64.    Adrianne was reluctant to meet with Miller who she did not know, who was a
male and who headed the School's campus police.

65.    Nonetheless, the next day, on December 6, 2012, Adrianne went to see Miller at
the CCC Public Safety Office.

66.    Adrianne brought her friend, Charlena Scharborough [hereinafter "Charlena"],
with her for support.

67.    Miller called female safety officer Gretchen Healy [hereinafter "Healy"] into the
room. He said that Healy was there to take notes.

68.    As with Drake, at no point did anyone inform Adrianne about her rights under
Title IX, give her the contact information of CCC's Title IX coordinator, offer her a no-contact
order, or explain that the school had an obligation to investigate separate from any criminal
investigation. Adrianne was never offered support services or measures to deal with any concerns
she might have or hostile environment on campus.

69.    Instead, Miller relentlessly interrogated Adrianne. He demanded that Adrianne
recite to him the details of her rape. She was not comfortable talking about what had happened in
that environment but she attempted to do so. He interrupted her several times with insensitive
and harsh questions and remarks such as "what were you wearing" and "have you had sex with
him before?" He asked her point blank, "why did you do this?"

70.    Miller essentially accused Adrianne of causing or participating in the sex with
Brescia consensually. He accused her of lying. He insinuated that it was her fault that she had
been raped.

71.    Adrianne felt attacked, and blamed her for being a victim.

9

72.     After Miller questioned Adrianne at length about the rape, he called Dean of Students Don Heins [hereinafter "Dean Heins"] into the room.

73.     Adrianne had never met Dean Heins before. Miller had not told Adrianne that Dean Heins would be entering the room. He did not introduce Dean Heins or identify his position at CCC. Adrianne didn't understand why Dean Heins had not participated in the interrogation from the beginning.

74.     Adrianne was very uncomfortable having another strange man in the room.

75.     Miller directed Adrianne to repeat the entire narrative to Heins.

76.     Adrianne did not understand why she was being subjected to another harsh interrogation. She was already distraught by the way that Miller had treated her.

77.     Although she did her best to re-explain to Heins what had happened to her, Adrianne was exhausted.

78.     At no time during this meeting, did Miller listen to what happened without implying that she had caused Brescia's assault or that she was lying about it. The only option offered to her was to report the rape to the Horseheads Police Department.

79.     Not surprisingly, having been grilled for some three hours by someone who was supposed to be interested in aiding her, Adrianne was fearful and extremely hesitant to go to the police, who presumably had even less reason to believe her or treat her fairly.

80.     As a result of this harsh and hostile interrogation, Adrianne was re-traumatized. Once again, she felt overwhelmed and overpowered by a dominant male. Adrianne felt terrified, devastated, suicidal and blamed for being raped.

## CCC's Disregard of Brescia's Stalking of Adrianne and Failure to Issue a No Contact Order

81.     Adrianne reported Brescia's stalking of her to Public Safety Officer Jim

Cunningham [hereinafter "Cunningham"] and CCC General Counselor Carol Carter [hereinafter

"Carter"].

82.     Although Cunningham and Carter told Adrianne that they would "talk to him" and

tell him to "leave her alone", CCC failed to issue a No Contact Order.

83.     Neither Cunningham nor Carter followed up with Adrianne to tell her what they

did or didn't do with Brescia.

84.     Adrianne continued to feel exposed, vulnerable and unsafe on campus.

## Adrianne was Re-Confronted and Re-Questioned by Public Safety Officer on Campus, This Time in Public

85.     On December 14, 2012, Miller cornered Adrianne on campus in public.

86.     Adrianne, along with several other students, were walking to their next class in

the Elmira Center. Miller appeared out of the blue and stopped Adrianne near the Center's main

entrance, a very busy location on campus. There were approximately a dozen students

surrounding Adrianne in this very public area, many within in easy earshot of any conversation.

87.     Miller made no effort to speak quietly so others did not hear their conversation

about Adrianne's report of being raped. Adrianne was taken aback that he would address her in

this way in front of so many people and with such disregard of her privacy or feelings.

88.     He demanded to know whether or not Adrianne had reported the alleged rape to

the Horseheads police department. Miller pressured Adrianne to make a decision. Miller directed

Adrianne to set up another meeting with him.

89.     As a result of Miller's public confrontation of her, Adrianne was even more

uncomfortable and fearful of Miller. She was unnerved and unable to focus during her classes.

She was shocked and disturbed that the head Public Safety Officer would accost her and reveal

her private, highly personal concerns in a public place. She was rattled that other students, even

if they didn't hear all that he said to her, would see the top Public Safety Officer confronting her

in such a harsh and disrespectful manner.

## Miller's Additional Intimidation of Adrianne, Removal of Her Emotional Support, and Subjection of Adrianne to a Hobson's Choice of Ongoing Interrogation or Sign-Off on His "Report"

90.     Adrianne brought her friend, Mary Preston [hereinafter "Mary"], with her to the

subsequent meeting with Miller.

91.     However, when they arrived at Miller's office, Miller cross examined Mary about

who she was and why she was there.

92.     When Mary said that she was there to support Adrianne, Miller rudely proclaimed

that Mary did not "belong here" and "needed to leave".

93.     Adrianne started to cry.

94.     Mary left Adrianne, weeping, alone in the room with Miller.

95.     Feeling exposed, vulnerable and at risk, Adrianne's primary concern was to get

out of that meeting and away from Miller as soon as possible.

96.     Miller told Adrianne that he had prepared a "report" to inform the police that she

didn't want to pursue a criminal complaint against Brescia. He told her that she would not be

permitted to leave the room, or the Public Safety Office, unless and until she signed the form he

had prepared.

97.     Adrianne skimmed the "report". She saw that Miller continued to blame Adrianne and misrepresent what she had told him. Under pressure to sign his "report", feeling helpless and as if she had no choice, and desperately wanting to get away from Milller, she continued to cry and signed the report.

98.     Miller seemed strangely satisfied.  He did not give Adrianne a copy of his "report".

99.     When she left the Public Safety Office, Adrianne continued to cry for hours. She felt bereft, abandoned and suicidal.

## CCC's Admission that Miller Had Acted Wrongly

100.    On December 17, 2012, still extremely distraught, depressed, and anxious about the rape and how she was treated by Miller, Adrianne emailed Dean Heins.

101.    She informed Heins how Miller treated her and told him that she was "really upset."

102.    Adrianne said that she was concerned that Miller confronted her in a highly public place on campus within earshot of many students and others and reported the matter to the Horseheads Police Department without her consent.

103.    Adrianne stated several times that she was made to feel like she had no choice.

104.    In response, Heins admitted that Miller's actions were wrong.

"I agree with you that Jeff also should have talked to you in an office and not in the hallway, no matter how discrete this conversation can be others can see the interaction and it puts you in an uncomfortable situation."

105.    Heins also admitted that Miller was highly inexperienced and made mistakes.

According to Heins, "Jeff's work here has been a learning situation from his last position as a State Patrol Officer and he, like myself, has had a lot to learn."

13

106.    Heins advised Adrianne that he would follow up.  He never did.

## CCC's Wholesale Failure to Investigate Her Rape and Abdication of Its Responsibilities under Title IX

107.    However, CCC did nothing to assist Adrianne.

108.    At no time did CCC investigate what happened to Adrianne.

109.    At no time did CCC handle the matter "administratively", as Miller claimed

would be done.

110.    At no time did Heins report back to Adrianne on her follow-up, as Heins claimed

he would.

111.    At no time did CCC issue a No Contact Order protecting Adrianne from Brescia.

112.    Until August 2014, nearly two years after her rape, the School provided no

training on Title IX or the Title IX coordinator's existence, role, or contact information.

## CCC's Failure to Protect Adrianne Resulting in Her Withdrawal from Activities and Classes

113.    Without a No Contact Order in place or other measures to protect her, Adrianne

withdrew from the CCC Activities Program, also attended by Brescia.

114.    Knowing that Brescia was still on campus and that she could encounter him at any

time, Adrianne was anxious, depressed, and extremely fearful.

115.    Adrianne was unable to focus on her studies.

## The Drop in Adrianne's Grades, Deteriorating Health and Depression Diagnosis

116.    Adrianne's grades suffered and her health declined.

117.    At the end of the 2013 spring semester, Adrianne was diagnosed with depression

and put on medication. She began to see a counselor regularly.

118.    She experienced debilitating anxiety and experienced suicidal thoughts.

119.    Adrianne withdrew from her chemistry class due to fears of running into Miller.

## After a Two Year Delay, CCC's Tardy Connection of Adrianne to the Title IX Coordinator

120.    In July 2014, Adrianne visited the CCC health office to speak with Nurse Candace Rosing [hereinafter "Rosing"] about different campus sexual assault initiatives.

121.    During their conversation, Adrianne mentioned to Rosing what had happened to her in 2012 and how she had been mistreated by Miller and CCC.

122.    On September 8, 2014, Rosing emailed Adrianne asking her to stop in the Health Office to speak with her about their prior conversation.

123.    On September 10, 2014, Rosing told Adrianne that she felt like the situation was poorly handled.

124.    Nearly two years after her assault– finally – Rosing put Adrianne in touch with the School's Title IX Coordinator, Nannette Nicholas [hereinafter "Nicholas"].

## Adrianne's Efforts to Use Her Sexual Assault as a Basis on Which to Help Others

125.    Meanwhile, Adrianne tried to turn her rape into a positive.

126.    Adrianne shifted her educational focus from becoming a nurse to becoming a social worker.

127.    Adrianne began volunteering at SARC, serving as a medical/legal advocate for victims of sexual assault and helping callers on the rape hotline.

128.    Adrianne also became involved with EQUAL, a CCC campus group devoted to issues of LGBT and women. In the fall of 2014, Adrianne was made EQUAL's President.

129.    Further, Adrianne accepted a position as a Resident Advisor ("RA") in one of the dorms. As an RA, Adrianne had the opportunity to help other students cope with the stresses of

campus life. She also appreciated that her service as an RA covered her room expense, which was very important to Adrianne's ability to afford her education.

## CCC's Retaliatory Reprimand of Adrianne for Supporting a CCC Victim of Sexual Assault

130.    CCC, however, continued to retaliate against Adrianne, this time in connection with her efforts to assist another victim of campus sexual assault.

131.    In early September 2014, CCC RAs Kenny Kearns [hereinafter "Kenny"] and Rob O'Connor [hereinafter "Rob"] contacted Adrianne about a female resident [hereinafter the "Resident"] who had reported to them that she had been sexually assaulted.

132.    Kenny informed Adrianne that he told the Resident that Adrianne volunteered at SARC, had experience with reports of sexual assault, would be entering the room with the Resident, and could explain the options available to victims of sexual assault.

133.    Using her SARC experience and training, in a brief meeting with the Resident, Adrianne advised the Resident to consider going to the hospital to get an exam. She said that SARC could provide the Resident with an advocate to accompany her to the hospital. Adrianne also informed her about the SARC hotline for victims of sexual assault.

134.    As per School protocol, as the RA on duty and to whom the Resident had turned, Kenny was responsible for reporting on the assault. Kenny did not inform Adrianne that he had nonetheless unilaterally decided that he could and would relinquish that responsibility and impose it on Adrianne.

135.    On September 13, 2014, the Resident asked Adrianne to drive her to the police station.

136.    Adrianne explained that as an RA she was not allowed to transport residents but offered to walk with her to the Public Safety Office to request a ride.

16

137.    Adrianne stayed with the Resident while she waited the Public Safety Office to respond, helping her get food and arrange to go to the police station.

138.    Adrianne subsequently learned that she was double booked as a SARC volunteer and on RA back up duty the next day, September 14, 2014.

139.    As per RA protocol, Adrianne arranged for another RA to cover Adrianne's shift, which Adrianne reported to A supervisor Jessica Benninger [hereinafter "Benninger"].

140.    Such RA coverage arrangements were routine.

141.    Additionally, Adrianne explained to Benninger that the Resident was scheduled to go to the police station that day and planned on bringing Adrianne with her, as her SARC advocate. Adrianne had also discussed the arrangement with SARC, which she told Benninger.

142.    Adrianne also emailed RA supervisor Jessica Simmons [hereinafter "Simmons"] to inform her of what she had told Benninger.

143.    Neither Benninger nor Simmons advised Adrianne that they believed that there was any kind of conflict of interest in her service as an RA and a SARC advocate. Nothing in the RA Handbook or training prohibited changes in shift coverage or volunteering for outside agencies.

144.    As she advised Benninger and Simmons she would do, Adrianne, in her capacity as a SARC volunteer, accompanied the Resident to the police department so that the Resident could report the rape.

145.    CCC Nurse Rosing, Title IX Coordinator Nicholas and others complimented Adrianne about her handling of this report and support for the victim.

146.    However, CCC apparently thought otherwise.

147.    Adrianne was reprimanded for these actions.

148.    Adrianne was perturbed at CCC's punishment of her for attempting to address sexual harassment and gender discrimination.

## Adrianne's Meeting with the Title IX Coordinator and CCC's Ongoing Failure to Investigate or Offer Services or Assistance

149.    On September 19, 2014, Adrianne met with Title IX Coordinator Nicholas and explained how she was treated when she reported her rape.

150.    Adrianne brought SARC employee Lauren W. with her for support.

151.    Adrianne explained to Nicholas that she was blamed for being raped, confronted in public in front of other students about her report, denied the support of her friends during meetings, offered no services or support from CCC, only offered the option of reporting the rape to the police, and forced to continue school in a hostile environment.

152.    Nicholas told Adrianne that Miller's treatment of Adrianne was "wrong".

153.    However, as before, CCC offered Adrianne no support, services or effort to diminish the hostile environment she continued to face. According to Nicholas, nothing could or needed to be done because Brescia had withdrawn from campus.

## CCC's Tardy, Paltry Offer to Adrianne of Services – Only After Adrianne Started to Investigate What CCC Had Done to Her

154.    On September 29, 2014, SARC employee Elisha W. contacted Miller to request information on how Adrianne could obtain her CCC file.

155.    Apparently, Adrianne's effort to assemble her documents and analyze CCC's misconduct woke someone at CCC up.

156.    A few hours later, Nicholas emailed Adrianne, stating "I wondered whether you wanted the College—say, me as the Title IX Coordinator—to look into this matter further."

157.    Nicholas stated, "I admit that the recent request for the prior reports led me to wonder if you wanted the College to take further action and, if so, just what that might be."

158.    Additionally, Nicholas stated, "[s]ince I am told the other student withdrew from the College, I guess there's nothing to be left to be looked into—other than any resources we can provide to you to assist you with dealing with this incident."

159.    This was the first time, almost two years after Adrianne reported the rape that Nicholas, or any employee at CCC, offered Adrianne any services or support.

## Adrianne's Unsuccessful Efforts to Enlist the Assistance of the Police Due to Miller's False Report

160.    After considerable effort, Adrianne finally felt strong enough to seek to hold Brescia criminally responsible for what he had done to her.

161.    On October 1, 2014, Adrianne visited the Horseheads Police Department to report her rape.

162.    However, Officer Remial informed Adrianne that it was unlikely that they could pursue the matter because of Miller's "report" which falsely stated that the sexual intercourse with Brescia was consensual.

163.    Adrianne felt abused again by Miller's false "report" and CCC's utter disregard for what happened to her.

## Adrianne's Request for An Investigation, Grievance Process, Apology, and Change in CCC Policy and Procedures

164.    On October 6, 2014, Adrianne emailed Nicholas and requested an investigation, grievance process, a formal apology, and for CCC protocols and policy regarding sexual discrimination on campus to be changed.

165.    Adrianne provided Nicholas with such a request in writing, including an explanation of why her rights had not been explained, she had no choice in how things were handled, CCC failed to follow up, and CCC failed to offer any help or ensure her security

166.    Nicholas stated that she would look into the matter.

167.    On October 13, 2014, Adrianne, accompanied by SARC employee Elisha W., met with Nicholas again.

168.    Nicholas informed Adrianne that how Miller handled the case was wrong and offered a written and oral apology from Miller.

169.    On November 6, 2014, Nicholas emailed Adrianne and retracted her offer of a written apology. Rather, she stated that only an oral apology would be appropriate.

170.    Incredibly, throughout her dealings with the Title IX coordinator, CCC once again failed to inform Adrianne of her rights under Title IX.

## CCC's Retaliation Against Adrianne for Advocating for Title IX Rights by Criticizing Her, Firing Her and Placing on Academic Probation

171.    On October 27, 2014, Adrianne and CCC student Abigail Drury [hereinafter "Drury] started a petition on change.org entitled "Corning Community College, Adopt the White House recommendations for ending sexual assault on campus!"

172.    The petition requested CCC to "implement a comprehensive sexual misconduct policy," "create better disciplinary systems," and "improve enforcement of penalties for sexual misconduct."

173.    At or about that time, Adrianne also became the President of EQUAL, a CCC campus group which supported LGBT and women's rights issues.

174.    On October 31, 2014, Adrianne met with RA Supervisor Simmons for the required RA weekly one-on-one meeting.

175.    Simmons informed Adrianne that the petition reflected poorly on the residence hall, making it look bad.

176.    Again, Adrianne felt punished for asserting her rights under Title IX.

177.    On the evening of October 31, 2014, Adrianne went to see a drag show at a local bar called Landos for the purpose of determining whether such a show would be appropriate as a campus fundraising event for EQUAL.

178.    She watched the show with an off-campus friend; she did not socialize with residents.

179.    Unexpectedly, one of the performers called Adrianne on stage and asked her to talk about EQUAL's upcoming fundraiser, which she did.

180.    At the end of the evening, one of the residents at the bar was intoxicated and did not have a ride back to campus.

181.    Concerned about the resident's safety, and well aware that other RAs have regularly driven residents back to campus without repercussion, Adrianne drove the student back to campus; no alcohol was brought on campus.

182.    When Adrianne and the resident arrived back at the dormitory, they both quietly went to their rooms and went to sleep.

183.    On November 6, 2014, RA Supervisors Simmons and Jessica Benninger [hereinafter "Benninger"][together "RA Supervisors"] met with Adrianne.

184.    The RA Supervisors claimed that Adrianne's driving of a resident back to campus on the night of October 31, 2014 was improper.

185.    They also reprimanded Adrianne for the petition she started on change.org, which they claimed was not "appropriate" for an RA.

186.    In a formal termination letter, Simmons stated that Adrianne had failed to

"[p]rioritz[e] [her] Resident Assistant role in relation to other areas of [her] life" and "[be] a role

model to residents and other Resident Assistants."

187.    Adrianne was shocked and disturbed that the RA Supervisors had fired her for

advocating for rights under Title IX and of women and LGBT.

188.    No other RA had ever been fired after driving a resident home.

189.    Adrianne was also upset at the substantial adverse financial impact this would

have on her.

190.    When Adrianne subsequently reported this to Nurse Rosing, Rosing confirmed

that this was wrong, and claimed that she would raise her firing with the CCC Behavior

Intervention Team [hereinafter "BIT"]. Adrianne heard nothing further from Rosing about this.

## Ongoing Efforts to Intimidate Adrianne from Exercising Her Title IX Rights and Right to be Free Of Gender Discrimination

191.    On November 7, 2014 RA Supervisors Simmons and Benninger met with

Adrianne again. They claimed that the purpose of the meeting was to determine whether

Adrianne wanted to continue living in the dormitory.

192.    However, their principal concern appeared to being recognized as firing Adrianne

because of her Title IX petition.

193.    Benninger, admitted that Adrianne's insistence on pursuing the petition and

standing up for herself was "exact reason I fired you".

194.    Benninger mocked Adrianne stating, "You're playing poor victim me, poor victim

me."

195.    Benninger then threatened Adrianne, "If you keep this up it is going to be harder

on you to live in this hall and make things worse for you."

## CCC's Retaliatory Threats to Adrianne, Placement of Adrianne on Academic Probation And Threat to Expel Her from the Dormitory In Violation of Title IX Rights and Discrimination Laws

196.    In further retaliation against Adrianne for advocating for Title IX and against

gender discrimination, on November 10, 2014, Dean of Students Nancy Latour [hereinafter

"Latour"] and RA Supervisor Benninger placed Adrianne on academic probation until the end of

the 2014-2015 school year.  Latour warned Adrianne that CCC had issued Adrianne two checks,

and if CCC issued a third check, Adrianne would be kicked out of the dormitory.

197.    Latour claimed that the purported reason for this drastic step was Adrianne's

driving of one intoxicated resident back to campus on one occasion, citing the Residence Life

Handbook. However, the Handbook Section cited by Latour prohibited the possession and

distribution of alcohol and disorderly behavior under the influence of alcohol, saying nothing

about transporting residents.

198.    The section cited stated:

"No student or his/her guest(s), regardless of age, may possess, consume, store, or
distribute alcoholic beverages within the residence hall or on college property. This
includes empty alcohol containers. In addition, any student under the influence of alcohol
who brings attention to himself or herself by making noise or general disruption or
publicly displaying intoxication is in violation of this policy. (…)"

199.    It is undisputed that neither Adrianne nor the resident brought alcohol to CCC or

had engaged in disruptive or disorderly conduct. Latour's rationale was utterly pretextual.

200.    On November 12, 2014 Student Life Director Nancy Agan [hereinafter "Agan"].

Agan informed Adrianne that Adrianne had improperly spoken about EQUAL on behalf of the

college at the Landos bar. Agan informed Adrianne that this was against "protocol" and implied

that if Adrianne did it again that she would no longer be the president of EQUAL.

23

201.     Adrianne believed that Agan was criticizing Adrianne for exercising her rights under gender discrimination and Title IX laws. She felt targeted and retaliated against for speaking up.

202.     Adrianne's belief was reasonable.

## Further Retaliation Against Adrianne and Adrianne's Withdrawal from CCC

203.     By letter dated February 6, 2015, Adrianne's attorneys wrote a letter to CCC regarding Adrianne's potential claims.

204.     On February 11, 2015, Adrianne received several hostile text messages from CCC student Melissa Snyder [hereinafter "Snyder"] about the letter.

205.     Snyder stated "Are you seriously suing the school for four million dollars?," "it's all over campus," "about the president of equal sueing the college!," and "tell me what in the world is wrong with the college that you are going to sue them for 4 million dollars."

206.     Adrianne had never discussed with Snyder the letter, her rape, or the school's actions.  Adrianne was disturbed that Snyder, other students, and others on campus had been provided with this private information about her.

207.     In approximately late February 2014, Adrianne's friend and CCC student Jessie Dye [hereinafter "Dye"] informed Adrianne that she could no longer associate with Adrianne.

208.     Adrianne and Dye used to get lunch on campus regularly and when Dye kept refusing to have lunch with her, Adrianne asked why.

209.     Incredibly, Dye informed Adrianne that the Assistant Director at Advancement Support Services, Kesha Davis [hereinafter "Davis"] told Dye not to associate with Adrianne. Davis is also Dye's cousin.

210.    Dye told Adrianne that she could not associate with Adrianne because she did not want to risk Davis' job.

211.    Thereafter Adrianne had increasing difficulty focusing on her studies and attending classes.

212.    On or about February 11, 2015, Adrianne learned that she was blocked from accounts on Facebook by two former "friends" CCC RAs, Melissa Snyder and Chelsie Landolf. Both very active on the Student Executive Board, often using their Facebook accounts to post about campus events and activities. By blocking her, they effectively cut Adrianne off from much of the campus community.

213.    On March 22, 2015, at 2:00 am and 5:00 am, Adrianne received phone calls from two male callers at unknown phone numbers.

214.    When she answered the phone, each caller said that he had found a note on his car which stated "call for a good fuck" and "call for a good time" with Adrianne's phone number and name listed.

215.    Adrianne did not know the CCC students who called her nor had she ever left a note on their car or anyone else's.

216.    These phone calls triggered Adrianne's rape flashbacks and caused her extreme stress and anxiety.

217.    Due to CCC's previous responses to her complaints of sexual assault and harassment, Adrianne felt targeted, retaliated against, and feared for her safety on campus. Her anxiety and panic attacks escalated. Adrianne had nowhere to turn.

218.    In the summer of 2015, Adrianne withdrew from CCC.

## CLAIMS

### FIRST CLAIM FOR RELIEF VIOLATION OF TITLE IX
### AGAINST DEFENDANT CORNING COMMUNITY COLLEGE
### 20 U.S.C. § 1681, *et seq*.
### (Hostile Educational Environment)

219.    Plaintiff repeats and re-alleges all prior paragraphs.

220.    Adrianne was subjected to physical sexual harassment, sexual assaults, sexual discrimination, and retaliation that were so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.

221.    CCC created and/or subjected Adrianne to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because

>       a.   Adrianne was a member of a protected class;
>
>       b.   she was subjected to sexual harassment in the form of sexual assault by another student;
>
>       c.   she was subjected to harassment based on sex; and
>
>       d.   she was subjected to a hostile educational environment created by CCC's lack of policies and procedures and failure to properly investigate and/or address the sexual assault and subsequent harassment and retaliation.

222.    CCC became a sexually hostile environment where her rapist stalked her on campus, she was blamed, chastised, and aggressively confronted by the CCC Head Safety Officer, and she became of the target of hostile retaliation by students and employees for reporting her rape and advocating for her rights.

223.   CCC and its Officials had actual knowledge of the sexual assault and the resulting harassment and retaliation of Plaintiff and reacted with deliberate indifference, eventually forcing Plaintiff to leave campus and lose her educational opportunities at the College.

224.   Because of the ongoing sexually hostile environment that CCC deliberately failed to address, Plaintiff suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: lost future earnings and loss of earning capacity; damage to delays in her pursuit of higher education; physical injury such as stomach pain and pain in her sides, and fear, anxiety, trauma, and emotional distress.

## SECOND CLAIM FOR RELIEF VIOLATION OF TITLE IX
## AGAINST CORNING COMMUNITY COLLEGE
## 20 U.S.C. § 1681, *et seq.*
## (Clearly Unreasonable Response)

225.   Plaintiff repeats and re-alleges all prior paragraphs.

226.   CCC had actual knowledge of Plaintiff's sexual harassment, discrimination, and retaliation.

227.   CCC's response to the harassment, discrimination, and retaliation was clearly unreasonable in light of the known circumstances.

228.   The harassment, discrimination, and retaliation, consisting of Brescia's rape of Adrianne, the risks to Adrianne's safety, the loss of her ability to continue at CCC, and the retaliation she endured, including losing her RA position and being placed on academic probation, was so severe, pervasive, and objectively offensive that it barred Adrianne's access to educational opportunities and benefits.

229.   Adrianne was subjected to the discrimination, harassment, and retaliation because of CCC's deliberate indifference to known acts of harassment, sexual violence, discrimination, and retaliation.

230.    Had CCC not been deliberately indifferent to Adrianne's harassment,

discrimination, and retaliation, Plaintiff have obtained her CCC degree. Instead, Adrianne was

forced to leave campus and is now a year behind in her studies.

231.    Because of CCC's deliberate indifference, Adrianne has suffered losses of

educational opportunities and benefits, along with injuries, damages, and losses, including but

not emotional distress, fear, anxiety, and trauma; lost future earnings and earning capacity; and

damage to and delays in her pursuit of higher education.

### THIRD CLAIM FOR RELIEF VIOLATION OF TITLE IX
### AGAINST CORNING COMMUNITY COLLEGE
### 20 U.S.C. § 1681, *et seq.*
### (Retaliation)

232.    Plaintiff repeats and re-alleges all prior paragraphs.

233.    Title IX prohibits exclusion from participation in, denial of benefits of, or being

subjected to discrimination under any educational institution program or activity receiving

federal financial assistance.

234.    Adrianne engaged in activities protected by Title IX, including but not limited to,

her initial complaint to CCC regarding sexual abuse and subsequent reports to CCC regarding

sexual discrimination, harassment, and retaliation by CCC and its staff, faculty, and students.

235.    Additionally, Adrianne engaged in protected activity in complaining about,

opposing or protesting perceived gender discrimination and refusing to engage in conduct that

she believed was unlawful in connection with her work for SARC and EQUAL.

236.    After Adrianne's participation in SARC and EQUAL, her efforts to pursue an

EQUAL fundraiser on behalf of the rights of women and LGBT community, and her creating a

petition encouraging CCC to update its Title IX policy, CCC treated Adrianne poorly, unfairly

criticizing her, firing her from her position as an RA, and otherwise subjecting her to adverse conditions as an RA.

237. CCC deliberately and intentionally subjected Plaintiff to retaliation because she engaged in activities protected by Title IX.

238. CCC and its staff, faculty, and students' ongoing retaliation and refusal to take action to end retaliation against Adrianne were in violation of Title IX.

239. Adrianne repeatedly complained about the retaliation to CCC officials and agents who responded with deliberate indifference, unreasonable responses, and by further retaliation against Adrianne.

240. As a direct and proximate result of CCC's unlawful acts, Adrianne suffered losses of educational opportunities and benefits, along with injuries, damages, harms, and losses, including, but not limited to: lost future earnings and loss of earning capacity; damage to and delays in her pursuit of higher education; and fear, anxiety, humiliation, trauma, and emotional distress.

## FOURTH CLAIM FOR RELIEF VIOLATION OF SECTION 1983 VIOLATION OF FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS AGAINST DEFENDANTS DOUGLAS,NICHOLAS, MILLER, HEINS, BENNINGER, SIMMONS AND DAVIS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITY 42 U.S.C. § 1983

241. Plaintiff repeats and re-alleges all prior paragraphs.

242. Under the Fourteenth Amendment, Adrianne had the right as a public school student to personal security and bodily integrity and Equal Protection of Laws.

243. CCC officials Douglas, Nicholas, Miller, Heins, Benninger, Simmons and Davis were all state actors acting under color of state law when they violated Nicole's clearly established rights under the Fourteenth Amendment.

29

244.    CCC officials Douglas, Nicholas, Miller, Heins, Benninger, Simmons and Davis subjected Adrianne to violations of her clearly established right to personal security and bodily integrity and Equal Protection of Laws by: failing to properly investigate Brescia's misconduct; failing to appropriately protect Adrianne from Brescia; failing to adequately train and supervise its employees; and manifesting deliberate indifference to the sexual assault and ongoing harassment and retaliation of Adrianne by other students and employees.

245.    CCC has and/or had unconstitutional customs or policies of a) failing to properly investigate evidence of criminal and tortious misconduct against a CCC student in the violation of her right to personal security and bodily integrity and b) failing to adequately train and supervise CCC employees about maintaining, preserving, and protecting students from violations of their right to personal security, bodily integrity, and Equal Protection of the Laws.

246.    CCC's policies and/or practices constituted disparate treatment of females and had a disparate impact on female students.

247.    CCC employees Douglas, Nicholas, Miller, Heins, Benninger, Simmons and Davis are or were at the time of events complained of within, policymakers for the purpose of implementing CCC's unconstitutional policies or customs.

248.    As a result, Adrianne has suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment, discrimination, and retaliation fostered as a direct and proximate result of Defendant CCC's deliberate indifference to her rights under the Fourteenth Amendment.

**FIFTH CLAIM FOR RELIEF**
***MONELL* LIABILITY FOR FAILURE TO TRAIN AND SUPERVISE PERSONNEL ON THE PROPER RESPONSE TO SEXUAL ASSAULT AGAINST DEFENDANT CORNING COMMUNITY COLLEGE 42 U.S.C. § 1983**

249.    Plaintiff repeats and re-alleges all prior paragraphs.

250.    Defendants Douglas, Nicholas, Miller, Heins, Simmons, Benninger, Latour and Davis were "state actors" working for CCC, a federally funded school system.

251.    Defendants Douglas, Nicholas, Miller, Heins, Simmons, Benninger, Latour and Davis acted under "color of law" when refusing to properly respond to Adrianne's sexual assault on school premises.

252.    Defendants Douglas, Nicholas, Miller, Heins, Simmons, Benninger, Latour and Davis failed to preserve Adrianne's constitutional right to equal protection as guaranteed by the Fourteenth Amendment.

253.    Under the Equal Protection Clause of the Fourteenth Amendment, Adrianne had the right to equal access to an educational environment free from harassment and discrimination.

254.    Defendants Douglas, Nicholas, Miller, Heins, Simmons, Benninger, Latour and Davis should have known that their response to sexual assault allegations must comply with federal law, particularly as outlined in Title IX's published and widely promulgated regulations.

255.    Defendants Douglas, Nicholas, Miller, Heins, Simmons, Benninger, Latour and Davis each violated Plaintiff's right to equal access by:

a.      failing to take immediate and appropriate action to investigate or otherwise determine what occurred once informed of possible sexual violence;

b.      failing to take prompt and effective steps to end the sexual violence, prevent its recurrence, and address its effects, whether or not the sexual violence is the subject of a criminal investigation;

c.      failing to conduct an adequate, reliable and impartial investigation and resolve the complaint in a prompt and equitable manner;

31

d.     failing to take steps to protect the Plaintiff as necessary, including interim steps taken prior to the final outcome of the investigation;

e.     failing to minimize the burden on the complainant; and

f.     failing to address and prevent instances of retaliation

256.   CCC violated Adrianne's Fourteenth Amendment right to equal protection by failing to properly train and supervise its employees as to these mandated requirements.

257.   These policies and/or practices constituted disparate treatment of females and had a disparate impact on female students.

258.   CCC's actions and lack of actions were the proximate cause of Adrianne's emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a result of WVSOM's deliberate indifference to her right to equal protection under the Fourteenth Amendment.

## SIXTH CLAIM FOR RELIEF
### *MONELL* LIABILITY FOR UNCONSTITUTIONAL CUSTOM AND PRACTICES AGAINST DEFENDANT CORNING COMMUNITY COLLEGE
### 42 U.S.C. § 1983

259.   Plaintiff repeats and re-alleges all prior paragraphs.

260.   Defendants have a custom, policy, or procedure of discriminating against students on the basis of sex. This custom, policy, or procedure allows their employees and agents to violate the constitutional rights of students, like Adrianne.

261.   In addition, Defendants have also been given notice on repeated occasions of a pattern of ongoing constitutional violations and practices by Defendants and the agents under their supervision. Said patterns and practices have resulted in the wrongful injury of Adrianne.

262.    Despite notice, Defendants have demonstrated deliberate indifference to these patterns and practices of constitutional violations by failing to take necessary, appropriate, or adequate measures to prevent their continued perpetration. This lack of adequate response by Defendants demonstrates the existence of a custom or policy by Defendants that tolerates and promotes the continued violation of constitutional rights.

263.    By committing the acts complained of herein, Defendants, while acting under color of law, have demonstrated a deliberate indifference to clearly established law.

264.    Defendants caused a constitutional deprivation of Adrianne's rights, namely the loss of Equal Protection under the law and a loss of Substantive Due Process under the law.

265.    In doing the acts complained of herein, Defendants violated Adrianne's Fourteenth Amendment substantive due process right by arbitrarily depriving Adrianne of protected interests.

266.    Defendants also violated Adrianne's Fourteenth Amendment Substantive Due Process right by failing to train employees to handle and understand the needs of sexual assault victims.

267.    Defendants further violated Adrianne's rights by failing to provide her with equal access to education opportunity as they did her peers.

268.    As a direct and proximate result of the unconstitutional policies and acts of Defendants, Plaintiff has sustained pain in suffering in violation of 42 U.S.C. § 1983.

## SEVENTH CLAIM FOR RELIEF
### *PRIMIA FACIE* NEGLIGENCE
### AGAINST DEFENDANT CORNING COMMUNITY COLLEGE

269.    Plaintiff repeats and re-alleges all prior paragraphs.

270.    Under Title IX, CCC owed a legal duty to properly investigate and resolve

Adrianne's report of sexual assault.

271.    Additionally, under Title IX, CCC owed a legal duty to take steps reasonably

calculated to end the harassment, eliminate its effects, prevent the harassment from recurring,

and prevent and address any retaliation.

272.    Adrianne is within the class of persons for whose protection Title IX was adopted.

273.    CCC's breach of its legal duty to Adrianne proximately caused Adrianne to suffer

from severe emotional distress and psychological damage, and her character and standing in the

community have suffered.

274.    The breach constituted *prima facie* negligence.

## EIGHTH CLAIM FOR RELIEF BREACH OF CONTRACT
## AGAINST DEFENDANT CORNING COMMUNITY COLLEGE

275.    Plaintiff repeats and re-alleges all prior paragraphs.

276.    In their Equal Employment and Educational Opportunity Policy [hereinafter

"EEEO Policy"], CCC states, "[t]he College is committed to maintaining an educational and

work environment that is free of any harassment and to fostering positive business and personal

conduct so that everyone, including students, employees, and visitors, is treated with respect and

dignity in a nondiscriminatory environment."

277.    Additionally, in their EEEO Policy, CCC guarantees "The College will take steps

to prevent discrimination and harassment, to prevent the recurrence of discrimination and

harassment, and to remedy its discriminatory effects on the victim(s) and others."

278.    Further, the EEEO Policy provides, "[a]ssistance will be available whether or not

a formal complaint is under consideration or even possible. It is the responsibility of the Director

to respond to all such inquiries, reports, and requests as soon as possible and in a manner

appropriate to the particular circumstances. This response may include interim measures to protect the parties during the investigation process. Such interim measures will not disproportionately impact the complainant."

279. Also, the EEEO policy requires, "[r]esponsible employees who observe or

become aware of incidents of discrimination and harassment, including sexual harassment, sexual assault, and sexual violence, are obligated to report this information to the Director."

280. CCC's Equal Employment and Educational Opportunity Complaint Procedure [hereinafter "EEEO Complaint Procedure"] states "(...) the College is obligated to investigate all charges, regardless of whether the victim/complainant chooses to proceed with either an informal or formal resolution, and make every effort to keep the complainants and respondents informed throughout the course of an investigation. The proceedings of any investigation are held confidential to the extent possible."

281. Further, the EEEOC Complaint Procedure states, "[r]etaliation against any individual for filing a complaint or for assisting or participating in the investigation of a complaint is strictly prohibited and may result in disciplinary action."

282. Additionally, the EEEOC Complaint Procedure guarantees, '[t]he Director will ensure that complainants are aware of their Title IX rights and available resources (both on- and off-campus), and the right, if any, to file a complaint with local law enforcement (...) The College will resume its Title IX investigation as soon as it is notified by the law enforcement agency that it has completed its evidence gathering process."

283. Also, the EEOC Complaint Procedure provides, "[i]f a complaint of sexual harassment or sexual violence is filed more than 90 calendar days following the alleged act, the

complainant will still be offered all appropriate victim support services and resources, including interim measures to protect the parties. In addition, the matter may be referred for appropriate employee or student disciplinary action."

284.    Adrianne foreseeably and reasonably relied on these assertions when accepting admission to, attending, and continuing to attend CCC.

285.    CCC breached its agreement with Adrianne when it failed to appropriately investigate and resolve her report of sexual assault and maintained an environment where Adrianne was sexual assaulted, harassed, and retaliated against repeatedly.

286.    Due to CCC's breach of contract, Adrianne suffered serious emotional distress and psychological damages and her character and standing in her community has suffered greatly.

## NINTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT CORNING COMMUNITY COLLEGE AND MILLER

287.    Plaintiff repeats and re-alleges all prior paragraphs.

288.    CCC and Miller's actions were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

289.    CCC and Miller acted recklessly when it was certain or substantially certain emotional distress would result from the conduct.

290.    The actions by WVSOM and Miller caused Nicole to suffer emotional distress so severe that no reasonable person could be expected to endure it.

291.    Due to WVSOM's intentional infliction of emotional distress, Nicole suffered serious emotional distress and psychological damages.

## TENTH CLAIM FOR RELIEF
## RETALIATION REGARDING GENDER DISCRIMINATION AGAINST DEFENDANT
## CORNING COMMUNITY COLLEGE
## N.Y. Executive Law Section 296(7)

292.   Plaintiff repeats and re-alleges all prior paragraphs.

293.   Plaintiff engaged in protected activity in complaining about, opposing or

protesting perceived gender discrimination and refusing to engage in conduct that she believed

was unlawful in connection with her work for SARC and EQUAL.

294.   CCC engaged in a campaign of retaliation against Plaintiff for engaging in this

protected activity.

295.   After Plaintiff's participation in SARC and EQUAL, and efforts to pursue an

EQUAL fundraiser on behalf of the rights of women and LGBT community, request that CCC

investigate and remedy it's prior failure to respond to her complaint of sexual assault, and her

creating a petition encouraging CCC to update its Title IX policy, CCC treated Plaintiff poorly,

unfairly criticizing her, firing her from her position as an RA, directing students to stay away

from Plaintiff, and otherwise subjecting her to adverse conditions.

296.   In engaging in this conduct, CCC violated N.Y. Executive Law Section 296(7).

297.   By reason of the foregoing, Plaintiff sustained damages in the form of lost

compensation or imputed earnings, pain and suffering, mental distress, and the like.

## ELEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING GENDER DISCRIMINATION AGAINST DEFENDANTS
## BENNINGER, SIMMONS, LATOUR AND DAVIS
## N.Y. Executive Law Section 296(6)

298.   Plaintiff repeats and re-alleges all prior paragraphs.

299.    Plaintiff engaged in protected activity in complaining about, opposing or protesting perceived gender discrimination and refusing to engage in conduct that she believed was unlawful in connection with her work for SARC and EQUAL.

300.    Defendants Benninger, Simmons, Latour and Davis participated in the campaign of retaliation against Plaintiff for engaging in this protected activity.

301.    As a result of Plaintiff's participation in SARC and EQUAL, efforts to pursue an EQUAL fundraiser on behalf of the rights of women and LGBT community, request that CCC investigate and remedy it's prior failure to respond to her complaint of sexual assault, and her creating a petition encouraging CCC to update its Title IX policy, Defendants Benninger, Simmons, Latour and Davis treated Plaintiff poorly, unfairly criticizing her, firing her from her position as an RA, warning students to stay away from her, and otherwise subjecting her to adverse conditions.

302.    In engaging in this conduct, and in violation of N.Y. Executive Law Setion 296(6), Defendants Benninger, Simmons, Latour and Davis aided and abetted CCC's violation of N.Y. Executive Law Section 296 (7).

303.    By reason of the foregoing. Plaintiff sustained damages in the form of lost compensation or imputed earnings, pain and suffering, mental distress, and the like.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

a)    Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of standing in her community, damage to her reputation, humiliation, loss of enjoyment, impairment of relationships, damage to her career and pecuniary losses including

out of pocket expenses caused by Defendants' conduct and incurred in response to these circumstances;

      b)      Punitive damages;

      c)      Statutory interest;

      d)      Costs;

      e)      Reasonable attorney fees; and

      f)      And whatsoever additional relief this court finds just and reasonable.

## **JURY DEMAND**

Now comes Plaintiff, Adrianne Summers, by and through her attorneys, Marsh Law Firm, and demands a trial by jury.

Dated: December 4, 2015

James R. Marsh
*admission pending*
Attorney for Plaintiff

MARSH LAW FIRM PLLC
P.O. Box 4668 #65135
New York, NY 10163-4668
Telephone | Fax: (212) 372-3030
Email: jamesmarsh@marshlaw.us